## (C. D. 1757)

### F. B. Vandegrift & Company, Inc. *v.* United States

United States Customs Court, Second Division

(Decided February 2, 1956)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Alfred A. Taylor, Jr., Mollie Strum*, and *William J. Vitale*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: We are here concerned with the dutiable status of certain imported merchandise described on the consular invoices as "tubes" or "Ironclad tubes." The collector of customs classified the merchandise as "Parts of storage batteries" within the purview of paragraph 320 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 320), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), and assessed duty thereon at the rate of 20 per centum ad valorem.

It is the contention of plaintiff that the importations should properly have been classified as manufactures in chief value of hard rubber

within the provisions of paragraph 1537 (b) of said act (19 U. S. C. § 1001, par. 1537 (b)), as modified by the General Agreement on Tariffs and Trade, *supra*, and the Presidential proclamation in connection therewith (83 Treas. Dec. 223, T. D. 51939), of the kind made dutiable at 12½ per centum ad valorem.

For ready reference, the competing statutory provisions in controversy are here set forth:

PAR. 320. Electric storage batteries and parts thereof, storage battery plates, and storage battery plate material, wholly or partly manufactured, all the foregoing not specially provided for, 20 per centum ad val.

1537 (b) Manufactures composed wholly or in chief value of india rubber known as "hard rubber", not specially provided for, finished or unfinished:

Syringes_____17½% ad val.
Other_____ _____12½% ad val.

During the course of the trial, numerous exhibits introduced by the plaintiff were received in evidence and are itemized below:

Exhibit 1—Sample of merchandise in controversy, except for two small holes which were not there at the time of importation.

Exhibit 2—Sample of the imported merchandise after it had been "warmed" and slotted.

Collective illustrative exhibit 3—A tube cut to desired length for use in making battery plates.

Illustrative exhibit 4—An individual slotted tube which has been assembled to a grid structure.

Illustrative exhibit 5—A tube containing oxide, with a sealer of polyethylene on the end thereof.

Collective illustrative exhibit 6—Two pieces of unslotted square tubing, two pieces of such tubing after being slotted, and two of said pieces after being cut to length for use in making battery plates.

Collective illustrative exhibit 7—A sheet separator or insulator.

Collective illustrative exhibit 8—A two-cell battery ready for the addition of acid and its first charge.

Collective illustrative exhibit 9—Another sized plate used with the instant tubing.

Exhibit 10—An illustration showing various parts of a battery such as are found in plaintiff's collective illustrative exhibit 8.

Illustrative exhibit 11—An illustration showing the breakdown of the battery.

When this case was called for trial, the parties hereto entered into an oral stipulation of fact that the merchandise in issue "is composed of hard rubber, made of india rubber."

Lester E. Lighton, who is connected with the Electric Storage Battery Co., the ultimate consignee of the merchandise in issue, in the capacity of vice president in charge of engineering since 1945, and who is charged with the responsibility of seeing that all engineering relating

to product development and design is carried out for the proper construction and advancement of the products of his company, and Kenneth W. Green, the purchasing agent of the Electric Storage Battery Co., testified on behalf of plaintiff. No evidence was offered by the defendant.

It appears from the witnesses' testimony that the imported tubes are made from india rubber by an extrusion process, coming from the mill as a continuous tube which is cut off in lengths of from 3½ to 4 feet. These cut tubes are then inserted in a mandrel, rolled in a talc, and vulcanized. The ends of the vulcanized tubes are cut off, and the articles are then cleaned and packed for shipment.

It is in this condition that the merchandise entered the United States and will control its classification for duty purposes.

It further appears from the testimony of plaintiff's witnesses that, after importation, the tubes are inspected for flaws, dry heated to a temperature of from 95° to 105° to prevent shattering, and, thereafter, accurately slotted part way through on one or both sides with 28 slots to the inch, except for periodic portions of about one-fourth inch that are not slotted, as represented by exhibit 2. The slotted tube in the length as imported is then cut to a predetermined desired length for a battery plate, as represented by collective exhibit 3, and there is always an unused scrap piece left over on the end after it is cut to length. The length of the tube as imported is always longer than the ultimate length desired. The cut-to-length slotted tube is then beveled on the ends to remove sharp projections, and it is again inspected. This cutting to desired length, slotting, and beveling operation results in a normal loss of weight of from 20 to 25 per centum, which becomes scrap material.

The cut-to-length slotted tube is then assembled with other similar slotted tubes on a grid structure, as represented by exhibits 4 and 9. The assembly of tubes and grid structure is placed on a jig, where the tubes are filled with red-lead oxide powder and jounced or agitated for about one-half to three-quarters of a minute, so that the oxide is diversified in and fills up each tube. Then, the open ends of the tubes containing the oxide on the grid structure are sealed with polyethylene, the extensions of the lead antimony spines of the grid structure being pressed into the polyethylene material to seal up the open ends, as represented by exhibit 5. At this point, we have a positive storage battery plate.

These plates are immersed for 6 hours in a strong solution of sulfuric acid and water, which changes the red lead in the tubes to lead sulfate, after which they are washed and placed in an oven for from 24 to 48 hours to dry out the moisture. At this point, the plates can be made into either positive or negative plates, but a negative plate has a different shape and contour. Thereafter, a number of plates are

burned with an acetylene torch to a single busbar to make a group of positive plates, and a group of negative plates is similarly assembled. The two groups are nested together with a rubber insulator between them, as represented by exhibit 7, and placed in a container or jar with a sealed cover to form a storage battery—a two-cell battery being represented by exhibit 8—which, after some electrolyte (sulfuric acid and water) is sealed in, is then ready for its first charge.

The record discloses that, whereas the particular importation in controversy was ordered for use in the manufacture of storage battery plates and was, in fact, so used, such rubber tubing can be and has been used for other purposes, such as conducting liquids or gases, and, particularly, for the conveyance of corrosive liquids.

It was explained by the witnesses that the imported rubber tubing was "ribbed" in order to give strength to the merchandise, but not designedly to give strength in its use as a storage battery part or material. In fact, similar tubing for ultimate use in storage batteries is not ribbed, as illustrated by plaintiff's exhibit 6.

As was stated above, the merchandise in issue has been classified by the collector of customs as "parts of storage batteries" in paragraph 320 of the Tariff Act of 1930, as modified, *supra.*

The definition of what constitutes a "part" of an article is so well established in customs law that it does not need repetition. Note *United States* v. *Willoughby Camera Stores, Inc.,* 21 C. C. P. A. (Customs) 322, T. D. 46851. It is likewise well established, as was stated by our appellate court in *United States* v. *Schenkers, Inc.,* 17 C. C. P. A. (Customs) 231, T. D. 43669, that—

* * * where a material has been so advanced in manufacture as to have reached a stage in which it is clearly incapable of being made into more than one article, then it shall be deemed, even though unfinished, to have been so dedicated to a single use as to fix its status as a part of that article.

The foregoing principles, when applied to the rubber tubes in controversy which have been produced from india rubber by an extrusion process and from continuous tubing have been cut into 3½- to 4-foot lengths, rolled in a talc, vulcanized, cleaned, and packed, and which the record shows may be used for siphoning liquids from one container to another as well as for use, after further manufacturing processes, as storage battery plate material or as parts of electric storage batteries, lead to the conclusion that, at the time of importation, the merchandise had not "reached a stage in which it is clearly incapable of being made into more than one article" and, therefore, can not be deemed to "have been so dedicated to a single use as to fix its status as a part" of storage battery plates.

It follows, therefore, that the presumption of correctness attaching to the collector's classification of the merchandise as "parts of storage batteries" in said paragraph 320 has been overcome. No legal pre-

sumption exists to the effect that the merchandise is "storage battery plate material" within the purview of said paragraph. As was stated by our appellate court in *United States* v. *White Sulphur Springs Co.*, 21 C. C. P. A. (Customs) 203, T. D. 46728—

Where a paragraph of a tariff act makes provision for two or more distinctly different kinds of merchandise and the collector of customs specifically classifies an importation as one of those kinds, the legal presumption that such classification is correct attaches, but such presumption of correctness is limited to the specific classification made, and, in case it be found that the merchandise is not such specific kind, it may not be held that there is a legal presumption that it is some other kind which happens to be included in the same paragraph but of which the appraiser gives no description and the collector makes no mention in his classification.

Our next consideration will be whether or not the record before us would support the conclusion that the rubber tubes, represented by plaintiff's exhibit 1, come within the designation of "storage battery plate material, wholly or partly manufactured," in paragraph 320, *supra*.

In a determination of this question, reference is made to several analogous cases which are deemed particularly worthy of note.

*Worthington* v. *Robbins*, 139 U. S. 337, is relied upon by counsel for both parties hereto, to support their opposing contentions. The importation there before the court consisted of two lots of white hard enamel. The collector of customs had classified it as "watch materials, not specially enumerated or provided for." It was the contention of plaintiff therein that the importation should have been classified as articles manufactured in whole or in part, not enumerated or provided for.

In support of the plaintiff's claim, the decision of the Court reads in part as follows:

* * * the article was, when the tariff act applying to it was enacted, known and described in trade as "white hard enamel," and "is used for various purposes, including the making of faces or surfaces of watch dials, scale columns of thermometers, faces or surfaces of steam-gauge dials, and for other purposes when a smooth or enamelled surface is desired." It thus appears that it is not used exclusively for the making of faces or surfaces of watch dials; and, although it is stated in the statement of agreed facts that the enamel in controversy was imported by the plaintiffs for use in making watch dials, and was in fact so used, there was nothing to prevent them from selling it to persons who would use it for the other purposes for which it is stated it is used.

It appears further, that the form or condition of the merchandise as imported affords no evidence or indication of the use to which it is to be applied; that, in the form or condition as imported, it cannot be used for any of the purposes mentioned, nor for any purposes whatever of practical use to which it is adapted or ever applied; and that, before it can be applied to any practical use, its present form and condition must be changed by grinding or pulverizing, and new processes of manufacture be applied.

It is apparent, from the facts stated, that the customs officers could not determine from an examination of the article to which of the uses named it was to be applied, or that it was to become the material of a watch. In order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported. In order to be dutiable as "watch materials," the article, when imported, must be in such form of manufacture as to show its adaptation to the making of watches.

The article in question was, to all intents and purposes, raw material. If it were to be classed as "watch materials," it would follow that any metal which could ultimately be used, and was ultimately used, in the manufacture of a watch, but could be used for other purposes also, would be dutiable as "watch materials." In order to be "watch materials," the article must in itself bear marks of its special adaptation for use in making watches. The fact that the article in question was used in the manufacture of watches has no relation to the condition of the article as imported, but to what afterwards the importer did with it.

In *Athenia Steel & Wire Co.* v. *United States*, 1 Ct. Cust. Appls. 494, T. D. 31528, the question of the proper classification of certain flat pieces of steel, 3 inches by one-eighth of an inch in thickness and 30 or more feet in length, imported in coils, was in issue. The merchandise had been classified by the collector of customs as "steel in all forms and shapes not specially provided for" in paragraph 135 of the Tariff Act of 1897. Plaintiff contended that the merchandise should properly have been classified as wire rods in paragraph 136 of said act.

In affirming the classification of the collector, the court, in its decision, said—

* * * In order to bring any material for manufacturing within a tariff designation which covers one of its ultimate uses it should be so far advanced by the processes applied thereto in the line of that particular ultimate use that, either from an examination *per se* evidences of its ultimate use are made clear, or so far advanced that its utility in any of its other possible uses shall have been destroyed. * * *

In arriving at this conclusion, the court was guided by the case of *Worthington* v. *Robbins, supra*.

In *United States* v. *National Importing Co. (Inc.) et al.*, 12 Ct. Cust. Appls. 186, T. D. 40169, our appellate court had before it an importation of amberoid. The importation had been described by the appraiser as—

Moulded amber bits, and consists of pipe bits shaped, but not bored. It was returned for duty at 60 per cent ad valorem under the provision for all smokers' articles whatsoever, finished or unfinished, n. s. p. f., in paragraph 1454, of the act of 1922.

The language of said paragraph 1454, so far as pertinent, reads as follows:

Pipes and smokers' articles * * * mouthpieces for pipes * * * all the foregoing of whatever material composed, *and in whatever condition of manufacture*,

whether wholly or partly finished, or whether bored or unbored * * *. [Italics supplied.]

The claim relied upon was that the importation should be classified in paragraph 11 of said act of 1922 as "amberoid, unmanufactured, not specially provided for."

The merchandise consisted of pieces of pressed amberoid, resembling pipe bits and cigarette holders, except that they had not been bored or so shaped as to be usable for such purposes in their imported condition. The evidence indicated that the importation was sold to manufacturers of pipes and smokers' articles, and to jewelers, and that pendants and drops were made from them by jewelry manufacturers.

The appellate court, in affirming the judgment of the court below, said—

The authorities seem to be unanimous in their support of the proposition that in order to take the importation out of paragraph 11 as amberoid, unmanufactured, it must be found that they were manufactured to such extent that they were committed or dedicated to a use as smokers' articles alone, and that if they had not been so manufactured when imported, and were in such form that they could readily be used for other purposes and were so used, they should be classified as amberoid, unmanufactured.—United States v. Lyon & Healy (4 Ct. Cust. Appls. 438; T. D. 33873), Wyman v. United States (T. D. 28924), Athenia Steel & Wire Co. v. United States (1 Ct. Cust. Appls. 494; T. D. 31528), Worthington v. Robbins (139 U. S. 337).

There is nothing about the material at bar which dedicates it to use as storage battery material; it is rubber tubing which is adapted to different uses, among them being for siphoning liquids from one container to another and, due to its characteristic of "hardness," is particularly adapted to the siphoning of corrosive liquids. Furthermore, its dimensions do not dedicate it to use as a material for storage battery plates, inasmuch as it is too long in its condition as imported to be of use as battery material. In fact, it is cut into three or five pieces before it is of a size suitable for battery use, and in such cutting operation there is a considerable amount of waste.

Defendant, in its brief, seems to stress the phrase "wholly or partly manufactured," which follows the words "storage battery plate material" in paragraph 320, supra. It must be kept in mind, however, that such language necessarily indicates that such material in a wholly or partly manufactured condition must be dedicated for a particular purpose—in the present instance, as material for storage battery plates. As pointed out, supra, the record before us does not support such a conclusion. The tubing, as imported, is no more storage battery plate material than is the lead which goes to make up the grid structure, the polyethylene used to seal the ends of the partly manufactured tubes, the red-lead oxide powder which is used to fill the tubes, or the sulfuric acid and water used in the bath to change the red lead in the tubes to lead sulfate.

Defendant further argues that, inasmuch as the importation in controversy was admittedly imported for the purpose of being processed into material for storage battery plates and was so used, there can be no question but that the merchandise is storage battery plate material and should be so classified. Such a line of reasoning, if employed generally in the classification of merchandise, would lead to chaotic results, inasmuch as the various uses to which imported crude materials might be put would govern their classification rather than the condition of the material at the time of importation being the controlling criterion.

Applying the doctrine of the *Worthington, Athenia,* and *National Importing* cases, above discussed, persuades us to hold that the tubes in controversy at the time of importation had not been so far advanced as to entitle them to classification as material for storage battery plates, partly manufactured.

The record discloses that the imported tubes have been manufactured from india rubber and, by vulcanizing, have assumed the status of "hard rubber." It is apparent, therefore, that they come within the purview of paragraph 1537 (b), *supra,* for "Manufactures composed wholly or in chief value of india rubber known as 'hard rubber,' not specially provided for, finished or unfinished."

Cases cited by the parties in their briefs, in addition to those specifically referred to in our decision, have been considered. Nothing therein contained is deemed to be contra to the conclusion herein reached.

Upon the record before us, from an examination of the imported merchandise in evidence as plaintiff's exhibit 1, and following the principles of law contained in the cases cited, *supra,* we sustain the claim of plaintiff that the merchandise in issue properly comes within the provision in paragraph 1537 (b) of said tariff act, as modified, *supra,* for manufactures composed wholly or in chief value of india rubber known as "hard rubber," not specially provided for, finished or unfinished, for which duty at the rate of 12½ per centum ad valorem is provided.

Judgment will be issued accordingly.